EXHIBIT 15

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

|   |   |
|---|---|
| EDWARD LITTLE and SHEILA ANN MURPHY, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> COMMISSIONER THOMAS FREDERICK, in his judicial capacity as Commissioner of the 15th Judicial District of Louisiana; CHIEF JUDGE KRISTIAN EARLES, in his official capacity as Chief Judge of the 15th Judicial District of Louisiana; and SHERIFF MARK GARBER, in his official capacity as Sheriff of Lafayette Parish, Louisiana, <br><br> Defendants. | Case No. 17-CV-724 <br><br> Judge Elizabeth E. Foote <br> Magistrate Judge Patrick J. Hanna <br><br> (Class Action) |

**EXPERT REPORT OF MICHAEL R. JONES, Ph.D.**

**I.      Background**

1.      I am the President of Pinnacle Justice Consulting, which I began in 2017. My associates and I (1) provide training and technical assistance for states, localities, and various justice system stakeholder organizations to enable them to improve their pretrial justice policies and practices based on the most recent research and legal developments; (2) assist states and local jurisdictions to design and implement strategic initiatives to modernize their pretrial justice systems; and (3) perform empirical research, data analysis, system and program evaluation, and expert testimony for criminal justice systems.

2.      I have been working since 2004 as a technical resource provider and consultant for the U.S. Department of Justice's National Institute of Corrections, providing criminal justice and pretrial training and technical assistance to dozens of jurisdictions nationwide.

3.      From 2010 to 2017, I worked at the non-profit Pretrial Justice Institute (PJI) where I served as a Senior Project Associate and then the Director of Implementation. At PJI, I directed the Bureau of Justice Assistance's three-year Smart Pretrial Demonstration Initiative, which was a three-jurisdiction project to test the cost savings and public-safety enhancements that can be achieved by moving to a pretrial justice system that uses research-based risk assessment and risk

management strategies to improve pretrial outcomes; provided pretrial training and technical assistance to hundreds of jurisdictions; conducted numerous workshops at national and state conferences; performed empirical research; and developed several resource materials for decision-makers and practitioners.

4. Before my work at PJI, I served for nine years as a county employee working for a local criminal justice coordinating committee in Jefferson County, Colorado, where I provided information, ideas, and analyses to justice-system decision-makers for local system improvement, including in pretrial justice.

5. During my career, I have written numerous criminal justice, pretrial, and psychological articles that have appeared in peer-reviewed journals and elsewhere.

6. I received my Ph.D. in Clinical Psychology from the University of Missouri-Columbia.

7. A copy of my curriculum vitae summarizing my professional experience and education is attached as Exhibit A. It includes a list of all publications I have authored in the past 10 years.

8. I have provided expert testimony on the subjects of this declaration in: *Mock v. Glynn County,* No. 2:18-cv-0025 (S.D. Ga. 2018); *Daves v. Dallas County, et al.*, 3:18-cv-0154 (N.D. Tex. 2018); *Booth, et al. v. Galveston County, Tex.*, 3:18-cv-0104 (S.D. Tex. 2018); *Schultz, et al. v. State of Alabama, et al.*, 5:17-cv-00270-MHH (N.D. Ala.); *Knight v. Sheriff for Leon County, Fla.*, No. 4:17cv464 (N.D. Fla.); *Buffin v. Hennessy*, 4:15-cv-4959 (N.D. Cal. 2018); *ODonnell v. Harris County*, 251 F. Supp. 3d 1052 (S.D. Tex. 2017).

9. I am being compensated at the rate of $300 per hour for my substantive work and $150 per hour for travel related to this case.

## II.   Materials Reviewed and Methodology

10. I attached as Exhibit B a list of materials that I reviewed when preparing this report. The studies I reviewed evaluate the effects of pretrial release and detention on multiple pretrial and case processing outcomes and the effectiveness of different pretrial risk management strategies on several pretrial outcomes.

11. In forming my opinions expressed in this report, I rely on the findings from multiple studies authored by various researchers and scholars in the pretrial justice field, who used data from numerous local and state jurisdictions throughout the United States. These studies use acceptable research methodology[1] and were performed in jurisdictions that have many similarities

---

[1] Some studies were published in peer-reviewed journals that target academic audiences. Other studies, sometimes by the same researchers, were published in other venues (e.g., by a non-profit organization). Although the academic, peer-review process can improve the quality of empirical research, it is not always necessary; many high-quality studies have been published elsewhere

2

in their pretrial policies and practices. Frequently, the results from these studies either complement or replicate one another. I also rely on the knowledge and experience I have gained over the last decade as a national expert and researcher in pretrial justice implementation and evaluation. Because of the research methods used and jurisdictions' similarities, and based on my experience working with hundreds of jurisdictions, I believe that the research findings and practices described below are largely generalizable to other jurisdictions.

### III. Opinions

12. Plaintiff's counsel asked me to express my opinion on the following five topics:

   a) Does pretrial detention for time periods more than 24 hours (including as little as 48 and 72 hours) have adverse consequences for detained persons and for the community?

   b) Does pretrial detention for time periods more than 24 hours (including as little as 48 and 72 hours) have an effect on the likelihood that a person will fail to appear or be arrested for a new offense while on pretrial release?

   c) Is there any valid evidence that secured money bail is more effective than unsecured money bail or non-monetary conditions of release at assuring appearance in court?

   d) Is there any valid evidence that secured money bail is more effective than unsecured money bail or non-monetary conditions of release at assuring public safety?

   e) Is secured money bail any more effective than unsecured money bail or non-monetary conditions of release at assuring the speedy release of arrested persons?

13. In many cases, criminal defendants are ordered released (i.e., they are "bailed") pretrial, but because their release is conditioned on secured money bail, they nevertheless remain in jail because they are not able to pay secured money bail. In many of these cases, the arrestees do not pose a risk sufficient to justify an order of pretrial detention. For these defendants, a less-restrictive, non-secured-money-bail alternative to pretrial detention would reasonably achieve the government's interests in promoting speedy pretrial release, reasonably assuring public safety, and reasonably assuring court appearance. When guided by empirical research on pretrial release and detention and pretrial risk management, local governments can more effectively manage

---

(see, e.g., Bechtel et al., 2016). Furthermore, the venue of publication does not guarantee the usefulness of the study to an issue at hand – in this case, helping local justice system practitioners achieve the best pretrial results they can in their jurisdiction. Researchers' understanding of the relevant issues (e.g., the legal parameters of pretrial decision-making, hypotheses tested, sampling methods used, data collected, and statistical tests used) are useful to assessing the comprehensiveness, validity, generalizability, and usefulness of a study, separate from the venue of publication.

3

defendants' pretrial risk without resorting to unaffordable secured money bail that results in unnecessary pretrial detention.

### A. Unnecessary Pretrial Detention Often Has Strong Negative Consequences for the Community, Defendants, and the Justice System

14. Several studies have shown that secured money bail contributes to unnecessary pretrial detention. Specifically, defendants attempting to obtain pretrial release with secured money bail (whether in the form of cash, surety, property, or deposit to the court) have lower release rates compared to defendants who do not have to pay secured money bail prior to release. Moreover, people who are required to pay secured money bail to be released wait in jail longer than defendants who are released without being required to make a money payment. Not surprisingly, the higher the money bail amount, the greater the number of defendants who remain in pretrial detention (Reaves, 2013; M. Jones, 2013; Cohen & Reaves, 2007). Phillips (2012) also found a strong link between secured money bail requirements and increased pretrial detention.

15. To test whether secured money bail indeed is the cause of pretrial detention for many defendants, researchers asked defendants why they had not posted their money bail. When defendants in four counties in three states were asked, 56% reported that they could not afford the amount set, and 34% reported that their family could not afford the amount set. Only 15% of defendants reported that they had other court issues (e.g., a hold from another jurisdiction) keeping them in detention (Kimbrell & Wilson, 2016). Similarly, other researchers found that nationally in 2002 (the most recent year the U.S. Bureau of Justice Statistics conducted the survey) 128,000 persons were in jail on any given day because they could not afford the monetary amount of their bond, and that pretrial detention has increased by 31% since that time frame (Sawyer, 2018; Rabuy & Kopf, 2016). These results match the findings of a small investigation my staff and I conducted at the request of county-level decision-makers (i.e., local judges, sheriff, city police, defense attorneys, pretrial services) in Jefferson County, Colorado. We found that approximately 75% of defendants who had not posted their bonds within 48 hours said they or their family members were not able to meet their bond's financial condition, and 20% had not posted bond because they had a hold from another case or were serving a sentence on another case. The findings of these studies are not surprising given that about 4 in 10 adults in U.S. households would not be able to pay for an unexpected expense of $400 or more unless they sold something, borrowed the money from others, or charged it to a credit card to pay off over time (Federal Reserve Board, 2018).

16. Thus, secured money bail either denies release to, or delays release for, many defendants who otherwise would be releasable immediately on non-monetary conditions and whose risk could be adequately managed in the community. Because Lafayette Parish uses secured money bail for nearly all booked misdemeanor and felony defendants, it is likely that these defendants unnecessarily remain in the county jail until they are released on non-monetary conditions (if they are released on non-monetary conditions).

17. Defendants of color (e.g., African American; Latino) are more frequently ordered to pay money bail prior to release than are white defendants, while controlling for other factors, such as current charges and criminal history. Also, the amounts of money they must pay for release are often higher than the money bail that white arrestees are required to pay. Consequently, persons

of color are more often detained than are white arrestees (C. Jones, 2013; Schlesinger, 2005; Demuth, 2003). Because Lafayette Parish uses secured money bail, it is likely that local defendants of color spend more time in local pretrial detention because of money bail than do comparable white defendants.

18. Multiple studies, as summarized below, have shown that pretrial detention, including for time periods more than 24 hours (including as little as 48 and 72 hours), leads to negative outcomes for the justice system, the community, and defendants, such as:

a) Decreased rates of court appearance and law-abiding behavior during the shorter-term, pretrial period;

b) Increased rates of recidivism in the longer-term, post-pretrial period;

c) Increased likelihood of convictions, guilty pleas, sentences to incarceration, longer sentence length, and greater jail and prison crowding; and

d) Increased collateral harm to defendants, including negative effects on employment, housing, and the ability to care for dependent family members.

**B.  Pretrial Detention is Associated With Reduced Court Appearance and Public Safety**

19. Even just a few days in pretrial custody can have a negative effect on pretrial success. Lower-risk defendants who are released within two to three days of arrest are 39% more likely to be arrested for new pretrial criminal activity than are comparable lower-risk defendants who are released immediately (within one day).[2] As the delay in release becomes longer (5-7 days), the chance of pretrial failure (new arrest) becomes 50% more likely. This likelihood increases to 56% when release is delayed for 8 to 14 days (Lowenkamp et al., 2013a).

20. Further, the longer that lower-risk defendants are kept in pretrial detention more than one day, the greater the likelihood that they will fail to appear in court after they are eventually released, again, when controlling for other relevant characteristics. This pattern of increased likelihood of arrest and lowered court appearance as release is delayed also applies to moderate-risk defendants. In contrast, delays in time to release do not affect the behavior of higher-risk defendants; they tend to demonstrate pretrial failure at equal rates whether they are released immediately or after several days or weeks of pretrial detention (Lowenkamp et al., 2013a).

---

[2] The two groups are comparable because they were matched (i.e., they did not statistically differ) on relevant characteristics such as age, race, gender, current charges, and pretrial risk level. Because the groups were matched on the characteristics that could potentially affect the outcome of interest (i.e., new pretrial arrest), the chances that these characteristics could have influenced the observed outcomes are greatly reduced. Thus, the characteristic they did differ on – length of time in pretrial detention – most likely affected the new-pretrial-arrest outcome and accounts for the different rates of new arrest between the two groups. This research method of matching enables researchers to make inferences about causation that would otherwise not be possible.

5

Holsinger (2016a) found similar results three years later when studying defendants in a separate jurisdiction near Kansas City, Missouri.

21. As discussed previously, the posting of money bail delays the pretrial release of defendants who eventually are released. Lafayette Parish's pretrial practices of setting secured money bail at booking for nearly all defendants and then releasing these defendants after more than 24 hours of pretrial incarceration likely contributes to these released defendants exhibiting more failures to appear in court and more criminal behavior for which they are arrested during pretrial release.

### C. Pretrial Detention is Associated With Increased Longer-Term Recidivism

22. Detaining lower-risk defendants for longer than one day affects the likelihood of criminal activity up to two years later. Defendants who are released within 2 to 3 days are 17% more likely to engage in new criminal activity up to two years later compared to comparable defendants released within 24 hours. For those held 4 to 7 days, this longer-term recidivism worsens to 35%, and when release is delayed for 8 to 14 days, the recidivism rate further increases to 51%. This pattern of worsening recidivism as release is delayed is observed for moderate-risk defendants as well (Lowenkamp et al., 2013a).

### D. Pretrial Detention is Associated With Increased Convictions, Pleas, Sentences to Incarceration, Sentence Length, and Jail and Prison Crowding

23. There is strong evidence from several studies with rigorous research designs have demonstrated that defendants detained pretrial, often because they did not post their secured money bail, were more likely to plead guilty and/or be convicted than were released defendants with similar demographics, charges, and criminal history (see Heaton et al., 2017; Stevenson, 2017; Leslie & Pope, 2017; Lum et al., 2017; Dobbie et al., 2016; Gupta et al., 2016). Given the strength of this research finding, Lafayette Parish's use of secured money bail is likely causing unnecessary pretrial detention.

24. Pretrial detention results in a greater likelihood that a defendant will be sentenced to jail and that the sentence will be longer. A recent study compared similar defendants who were detained pretrial to those who were released, finding that detained defendants were four times as likely to be sentenced to jail and three times as likely to be sentenced to prison than those who were released. Furthermore, the jail sentences for the detained group, as compared to the released group, were three times longer and the prison sentences were two times longer (Lowenkamp et al., 2013b).

25. The above finding of harsher sentencing for those who are not able to obtain pretrial release replicates the findings of many other studies (e.g., Oleson et al, 2014; Sacks & Ackerman, 2014; Phillips, 2012; Williams, 2003). Because these studies used methods to ensure the groups did not differ on factors that could have influenced the observed outcomes (e.g., demographics, current charge, criminal history), it is most likely that the harsher sentences given are related to defendants' remaining in detention pretrial rather than the other factors.

26. Current pretrial practices, especially ones that are driven largely by the high use of secured money bail, contribute heavily to the nation's prison and jail crowding. Wagner and Sawyer (2018) found that (a) the United States has the world's highest incarceration rate; and (b) all of the increase in the nation's jail population from 2000 to 2016 was caused by an increase in the number of unconvicted persons; the number of convicted/sentenced persons was not a contributing factor. Lafayette Parish's practices of using secured money bail is likely contributing to higher than necessary pretrial detention.

### E. Pretrial Detention is Associated With Increased Collateral Harm to Defendants

27. Pretrial detention for three days or less has been shown to negatively influence defendants' employment, financial situation, and residential stability, as well as the well-being of dependent children. This negative impact worsened for defendants who were detained pretrial for more than three days (Holsinger, 2016b). Similarly, another recent study found that many defendants who could not afford money bail lost their jobs and/or housing, even when they were detained for three days or less (Kimbrell & Wilson, 2016).

### F. Studies That Have Analyzed the Effectiveness of Secured Money Bail and Financially Unsecured Risk Management Conditions Demonstrate That the Unsecured conditions of Pretrial Release are Overall More Effective than Secured Money Bail

28. All pretrial release conditions can be divided into two types: (1) non-financial (e.g., court date reminders, pretrial monitoring, no contact orders, substance testing, electronic monitoring, car breathalyzers, curfew, etc.); and (2) money bail. Money bail can be further divided into either (a) secured (cash, surety, property, or deposit to the court that occurs prior to release from custody), or (b) unsecured (possible payment to the court if the defendant fails to appear).

29. In 2012, I co-authored with three other researchers and pretrial experts a literature review of the effectiveness of money bail as a tool for managing the risk of new pretrial arrest and failure to appear (Bechtel et al., 2012). We reviewed the studies that had been published to date and that were, at the time, the most relevant, most inquired about, or most cited in the national discussion about using money bail to manage pretrial risk.

30. We found that although a few published studies considered whether a connection existed between money bail and pretrial outcomes, all of them had at least one of the following three serious limitations that impede their usefulness for informing pretrial policy-making and practice.

   a. First, some studies (e.g., Helland & Tabarrok, 2004) relied exclusively on data from the Bureau of Justice Statistics' State Court Processing Statistics data series, even though the Bureau itself later cautioned in a Data Advisory that its data should not be used for evaluating the effectiveness of various pretrial release methods (see Bureau of Justice Statistics, 2010). Thus, these studies should not be relied upon for evaluating the effectiveness of secured money bail.

7

  b. Second, some studies investigated the link between secured money bail and only one (court appearance) or occasionally two (court appearance and public safety) pretrial outcomes. Yet, no study looked at the link between money bail and the third goal[3] of any bail determination—pretrial release. Thus, we concluded that these studies were insufficient for guiding pretrial policy-making and practice because they failed to show that money bail could simultaneously and effectively address a jurisdiction's three legally required goals: (1) maximize court appearance, (2) maximize public safety, and (3) maximize release from custody.

  c. Third, the methodological design of some other studies did not meet minimal social science standards needed to evaluate the effectiveness of pretrial release conditions.

  31. Less than one year after the literature review in 2012, one additional study that investigates the link between money bail and pretrial outcomes was published (see Morris, 2013).[4] Morris' 2013 study (and data update in 2014 and publication of the 2013 study in 2017 [i.e., Clipper et al.]) still had some of the same shortcomings as the studies in the literature review. Most importantly, it did not analyze the impact of secured money bail on release rates. The inclusion of the impact of secured money and non-monetary bail on release rates (and therefore pretrial jail bed use) would be necessary to determine which kind of release condition is the most cost-beneficial, as the study purported to evaluate. Details on how to properly compute a pretrial cost-benefit analysis can be found in the Crime and Justice Institute's (2015) publication, "A Cost-Benefit Model for Pretrial Justice." Furthermore, given the Clipper et al. (2017) study indicates that pretrial release is a goal of the pretrial justice system (pg. 6), analyses on release rates should have been included when evaluating the effectiveness of the various release types.

  32. To answer important research questions about the effectiveness of secured money bail and non-secured or non-financial release, three studies that address the important shortcomings of the previous studies were conducted. In 2013, I conducted a study that simultaneously looked at all three outcomes (court appearance, public safety, and release/detention rates). To ensure that the two groups of defendants (those who were released on secured money bail and those who were released on unsecured recognizance) who were compared to one another were the same, I did what no other study had done to date: I matched defendants in the different release-type groups (money bail vs. unsecured recognizance) on their pretrial risk levels as measured by an actuarial pretrial assessment tool—the Colorado Pretrial Assessment Tool.

  33. I found that for defendants of all pretrial risk levels (lower, moderate, or higher):

---

[3] See the American Bar Association's (2007) discussion, citing to U.S. Supreme Court case law and other federal resources, for why release, court appearance, and public safety are all important goals of the pretrial justice system.

[4] This declaration condenses Morris' study in 2013, the study's data update in 2014 (Morris, 2014), and publication of the 2013 study in 2017 (Clipper et al., 2017) into a single discussion because the studies rely on the same or very similar data from the same jurisdiction (Dallas, Texas) in adjacent years, used the same statistical methods, and yielded near-identical findings.

      a. Releasing a defendant on an unsecured bond (the court may require the defendant to pay money if he/she fails to appear) is as effective at achieving public safety as is secured money bail.

      b. Unsecured bond is as effective as secured money bail at achieving court appearance.

      c. Unsecured bond frees up more jail beds than does secured money bail because: (a) more defendants with unsecured bonds are released; and (b) defendants with unsecured bonds have faster release-from-jail times, when compared to secured money bail.

      d. The higher the secured money bail amount, the greater the pretrial jail bed use; but the higher money amounts did not result in higher court-appearance rates.

      e. The groups of people released on unsecured bond and secured money bail included the same number of people at-large on FTA warrants, indicating that the use of secured money bail did not increase the likelihood that a person who missed court would be located and returned to custody. This finding matched another finding I observed a few years prior to this study, following a brief investigation my staff and I conducted at the request of county-level decision-makers (i.e., local judges, sheriff, city police, defense attorneys, pretrial services) in Jefferson County, Colorado. We found that commercial bail bondsmen rarely, if ever, brought defendants who had failed to appear back to jail or court, as evidenced by: (1) Approximately 99% of arrests of people with outstanding FTA warrants were effected by local law enforcement, with the remaining 1% effected by commercial bail bondsmen; (2) in a one-month sample, out of approximately 250 contacts between bail bondsmen and the local criminal court, 100% involved one of the following: bondsmen asking to be absolved of the bond, asking the court for the defendant's current address or contact information, or asking when their client's next court date was scheduled; not one of the contacts involved a bondsman returning to court a defendant who had failed to appear; and (3) law enforcement leaders (including the Sheriff's Patrol Division Chief, several police chiefs from the county's largest municipalities, and the police chiefs' senior staff members) reported that they could not recall any instance in their careers when a bondsman had contacted them to arrest one of their clients.

      f. Finally, many defendants, as the M. Jones (2013) study showed, were incarcerated for the pretrial duration of their case and then were released to the community after they pled guilty and were sentenced (see M. Jones, 2013).

    34. Based on these results, I concluded that jurisdictions can make data-guided changes to local pretrial case processing that would achieve their desired public-safety and court-appearance results while reserving more jail beds for higher-risk defendants and people who are convicted and sentenced. I reached this conclusion because the data show that *if* money release conditions of any kind were to enhance defendants' court appearance, unsecured bond would achieve the same benefit, but it would accomplish that appearance rate while increasing

9

defendants' pretrial release rates, reducing delays in release times, and using far fewer jail beds, all of which avoid costs to the local justice system (M. Jones, 2013).

35. Brooker et al. (2014) conducted a separate study to answer the same research questions as the M. Jones (2013) study. Brooker was the primary researcher and author of this study, and I served as a contributor. This study used a dataset and methodology different from the M. Jones (2013) study, but found similar results regarding the link between secured money bail/unsecured bond and court appearance, public safety, and release from custody/jail-bed use, after studying all three simultaneously in one study.

36. We found that for defendants who did not differ in their charge level (felony, misdemeanor) and who were ordered to pretrial monitoring:

   a. Judges who more frequently authorized release on unsecured bonds achieved the same public-safety rates as did judges who more frequently required secured cash or surety money bail as conditions of release.

   b. Judges who more frequently authorized release on unsecured bonds achieved the same court-appearance rates as did judges who more frequently required secured cash or surety money bail as conditions of release.

   c. Judges who more frequently authorized release on unsecured bonds had a higher release-from-jail-custody rate than did judges who more frequently required secured cash or surety money bail as conditions of release, thus using fewer jail beds and avoiding the associated cost to the justice system.

   d. Judges who more frequently authorized release on unsecured bonds had faster release-from-jail-custody times than did judges who more frequently required secured cash or surety money bail as conditions of release, thus using fewer jail beds and avoiding costs (see Brooker et al., 2014).

37. These two latter studies (Brooker, 2014; M. Jones, 2013) show that secured money bail detains more defendants in jail and delays their release, if they are released, than do unsecured bonds, and without improving either public safety or court appearance.

38. Additionally, Brooker (2017) later found a similar pattern of results in Yakima County, a rural jurisdiction in Washington that is similar in size and demographics to Lafayette Parish. For a large number of defendants, judges in Yakima County replaced secured money bail with several practices informed by empirical research (e.g., authorizing release on recognizance instead of secured money bail for a greater number of arrestees, requiring pretrial monitoring for some released defendants). After these changes were made, the jurisdiction observed an increased pretrial-release rate of 20 percentage points with no decrease in public safety or court appearance. Furthermore, racial/ethnic equity in release was improved, with the release rates for persons of color significantly increasing to become equivalent to that of white people.

*Pretrial Risk Management with Financial Conditions of Release*

39. Some judges use secured money bail in an attempt to manage defendants' pretrial risk. Nationally, judges set money bail amounts in one of two ways: (1) They use (and/or authorize the local jail to use) a printed secured money bail schedule that assigns a bail amount to the defendant usually based on one or more of the defendant's charges; or (2) they assign a secured money bail amount based on their own judgment, and not from a printed schedule, after considering the defendant's charges and/or sometimes other factors. Because a printed secured money bail schedule is not used for defendants in Lafayette Parish, a judicial officer can set secured money bail during defendants' first appearance in court. However, the secured money bail amounts used in Lafayette Parish would be insufficient for managing pretrial risk for several reasons:

    a. First, the money bail amounts can only serve as incentives to return to court if they are posted. If defendants or defendants' families do not post the money amount (either directly to the court or through a commercial bail bondsman), then whatever incentives the financial condition theoretically provides can never operate because the person remains detained. In contrast, when non-financial conditions (e.g., court date reminder, as discussed below) are imposed, they are always operative because they do not impede release.

    b. Second, the amount of secured money bail set in court is based on the judicial officer's subjective, non-statistical assessment of the significance of various defendant characteristics such as, for example, the current charges and information contained in the arresting officer's documents, if known. In contrast, actuarial pretrial risk assessment tools, which account for defendants' charges and many other statistically relevant predictive factors, are much more accurate tools for predicting pretrial risk of nonappearance or new arrest. If defendants' current charge is predictive of pretrial risk of nonappearance or new arrest, it plays an incomplete and relatively small role compared to other characteristics of defendants (Laura and John Arnold Foundation, 2016).

    c. Third, secured money bail amounts assume that more serious charges place defendants at higher pretrial risk of nonappearance or new arrest, and that higher money bail amounts are needed to manage this risk. As discussed in the Risk Management section below, this assumption is flawed and/or is unsupported by empirical research (Gouldin, 2018). Specifically, there is no evidence from any study from within or outside of Lafayette Parish that particular money bail amounts, compared to other specific amounts (e.g., $500, $1,000), scheduled or set in court in Lafayette Parish are either necessary for or effective in reducing pretrial misconduct. Indeed, the various money bail amounts are not derived from statistical analyses to determine whether they actually are associated with managing pretrial risk. In contrast, as discussed below, there is empirical support that non-financial release conditions are effective at mitigating the risk of pretrial misconduct.

    d. Fourth, the money bail amounts set are not associated with a specific type of pretrial risk they are supposedly addressing – failure to appear, new arrest, or both. The pretrial outcome being addressed is important because any pretrial risk management practice can potentially be more or less effective for reducing these different types of pretrial failure. Specifically, when money bail cannot be legally forfeited when a released defendant is arrested for a new offense of any kind, as is the situation in Louisiana, then money bail is irrelevant to

public safety. Thus, the Lafayette Parish's use of money bail would only be attempting to address defendants' risk of failure to appear, and it is ineffective for that purpose. In contrast, pretrial monitoring is designed to reduce both failures to appear and new pretrial arrest, and it does not contribute to unnecessary pretrial detention of defendants who cannot post secured money bail.

*Pretrial Risk Management with Non-Financial Conditions of Release*

40. In my professional career, I have reviewed and become familiar with several research studies, most of them published in the past four to five years by reputable academic criminal justice researchers, so that I can provide data-guided technical assistance to decision-makers who want to make their pretrial justice systems more cost-effective through non-monetary risk management practices.

41. Many research studies have collectively shown that court date reminders are the single most effective pretrial risk management intervention for reducing (including preventing) failures to appear. These reminders, which can be delivered through in-person meetings, letters, postcards, live callers, robocalls, text messages, and/or email, have improved court appearance by approximately 30 to 50% (VanNostrand et al, 2011; Cooke et al., 2018; National Center for State Courts, 2017; Bornstein et al., 2012; Rosenbaum et al., 2012; Schnacke et al., 2012). I have worked with practitioners in multiple jurisdictions who have implemented such reminder systems. They have reported to me that they prefer reminder systems to secured money bail because, as compared to secured money bail, court reminders are relatively low-cost, do not result in unnecessary pretrial detention by preventing or delaying defendants' release, are not associated with bias on the basis of race and ethnicity, and/or greatly improve the desired outcome of court appearance.

42. Recent research has also indicated that defendants receiving pretrial monitoring have fewer failures to appear, with higher-risk defendants and then moderate-risk defendants, respectively, benefitting the most. Pretrial monitoring may also mitigate the risk of new arrests (Bechtel et al., 2016; Danner et al., 2015; Lowenkamp & VanNostrand, 2013; Goldkamp & White, 2006; Austin et al., 1985). Risk-informed and research-based pretrial monitoring is more effective than secured money bail at mitigating the risk of new arrest among higher-risk defendants because secured money bail has no relationship to public safety (including in Louisiana), and because pretrial monitoring, unlike secured money bail, does not result in unnecessary pretrial detention by preventing or delaying defendants' release. Indeed, Phillips (2012) reported that New York City experienced fewer failures to appear when higher-risk defendants posted money bail (for all other defendants, there was no link between money bail and court appearance rates); however, she concluded after her review of the research literature published at the time, and after a decade of empirical research on the city's pretrial practices, that any benefit in court appearance demonstrated by these select defendants could also be achieved through their receiving pretrial monitoring, which the city had not regularly used during the period that was the subject of the study.

43. Additionally, government officials from New York City (Stringer, 2018) and San Francisco (Cisneros, 2017) and an independent research and educational institution in Ohio (Buckeye Institute, 2018) have recently produced reports that demonstrate the high financial cost of a pretrial system that relies on money bail compared to a system that uses the non-monetary risk

12

management practices discussed previously. The City and County of Denver has also recently realized a net savings of $2 million per year because of a significant reduction in the use of secured money bail and its increased use of risk-informed pretrial monitoring (Pretrial Justice Institute, 2017). Baughman (2017) estimated cost savings in the tens of billions annually for the United States if current pretrial policies were to be similarly changed.

## IV.    Conclusions

44.    Empirical studies have shown that secured money bail is associated with increased pretrial detention, including for lower-risk defendants, because defendants are either never released pretrial or their release is delayed for days or weeks. This increased pretrial detention is further associated with decreased court appearance and increased rates of arrest; increased longer-term recidivism up to two years later; increased rates of conviction, guilty pleas, and jail and prison crowding; and increased collateral harm to defendants.

45.    Empirical studies have shown that unsecured bond conditions are as effective as secured money bail at achieving public safety and court appearance, but they do so with much less pretrial jail bed use and fewer costs to the legal system. Furthermore, interventions such as court date reminders and pretrial monitoring for select defendants have been shown to improve court appearance and/or public safety, and they do so without the unnecessary pretrial jail bed use that accompanies the use of secured money bail. Because of this robust research, many local jurisdictions and states are amending their practices and laws or court rules to reduce or eliminate secured money bail and replace it with more cost-effective, research-informed practices that effectively manage defendants' pretrial risk.

46.    Because Lafayette Parish relies on secured money bail and does not use research-based risk management practices, including court date notifications or risk-informed pretrial monitoring, County officials are missing the opportunity to reduce pretrial failures to appear and potentially pretrial criminal activity while simultaneously reducing unnecessary pretrial incarceration, its costs, and its associated harm to the community, defendants, and the justice system.

47.    Overall, I conclude that pretrial justice practices that include non-monetary (a) research-informed release and detention policies; and (b) research-based risk management strategies, often when used in combination with other practices,[5] are more effective at

---

[5] Other supporting practices typically include: law enforcement's use of citations instead of custodial arrests to the maximum extent possible; an experienced prosecutor reviewing law enforcement's arrest documents and making a charging decision prior to the first bond setting; defense counsel's representing defendants and participating in all bond settings (see Colbert et al, 2002, for research showing the benefits to defendants and the justice system when defense counsel participates in bond setting); judicial officers making an intentional, purposeful release-or-detention decision pursuant to federal and state law; and measurement and evaluation of

simultaneously achieving court appearance, protecting public safety, and maximizing the release of individuals from pretrial custody when compared to pretrial practices based largely on the use of secured money bail. Additionally, I conclude that the robustness of the research summarized above demonstrates that any local and state justice system in the United States, including the system in Lafayette Parish, Louisiana, can cost-effectively replace its secured-money-bail-based pretrial policies and practices with non-monetary ones.

48. Based on the research and reports reviewed above, I express the following opinions:

a) Opinion 1: Pretrial detention for time periods more than 24 hours (including as little as 48 and 72 hours) has adverse consequences for detained persons and for the community.

b) Opinion 2: Pretrial detention for time periods more than 24 hours (including as little as 48 and 72 hours) has a detrimental impact on accused persons' appearance in court and their law-abiding behavior while on pretrial release.

c) Opinion 3: Secured money bail is no more effective than unsecured money bail or non-monetary conditions of release at assuring appearance in court.

d) Opinion 4: Secured money bail is no more effective than unsecured money bail or non-monetary conditions of release at assuring public safety.

e) Opinion 5: Secured money bail increases pretrial detention, whereas unsecured money bail or non-monetary conditions of release do not.

I declare under penalty of perjury that the foregoing is true and correct to the best of my ability.

Executed on August 31, 2018

*/signature/*

Michael R. Jones

---

important process-and-outcome measures to inform potential improvements to future practices. All or many of these practices are recommended by the U.S. Department of Justice's National Institute of Corrections (National Institute of Corrections, 2017) and Bureau of Justice Assistance (Bureau of Justice Assistance, 2014); and the American Bar Association (American Bar Association, 2007). Furthermore, as can be seen in Stevenson (2018), when a jurisdiction implements several non-monetary pretrial practices but leaves secured money bail operational, desired pretrial outcomes such as court appearance and reduced jail use are diminished.