# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## LAFAYETTE DIVISION

| | | |
|---|---|---|
| **EDWARD LITTLE, ET AL.** | * | **CIVIL ACTION NO.  6:17-0724** |
| **VERSUS** | * | **JUDGE TERRY A. DOUGHTY** |
| **THOMAS FREDERICK, ET AL.** | * | **MAG. JUDGE PATRICK J. HANNA** |

## OPINION

This is a civil rights action brought by Plaintiffs Edward Little and Shelia Ann Murphy against Defendants Thomas Frederick, Commissioner of the Fifteenth Judicial District Court, and Judge Kristian Earles, former Chief Judge of the Fifteenth Judicial District Court.

 A bench trial was held in this matter on August 6, 2019.  The Court took the matter under advisement and instructed both parties to submit post-trial supplemental briefs.  After the transcript was complete, on September 20, 2019, Plaintiffs filed their post-trial brief [Doc. No. 196].  On December 3, 2019, after an extension of time, Defendants filed their post-trial brief [Doc. No. 201].  On December 16, 2019, Plaintiffs filed a reply brief [Doc. No. 202].

The Court hereby enters the following findings of fact and conclusions of law.  To the extent that any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such, and to the extent that any conclusion of law constitutes a finding of fact, the Court hereby adopts it as such.

## I.    FINDINGS OF FACT

### Parties

This matter has been certified as a class action.  Plaintiffs Edward Little ("Little") and Shelia Ann Murphy ("Murphy") have been designated as joint lead Plaintiffs.  They brought this

action on behalf of themselves and members of the class of "[a]ll people who are or will be detained in the Lafayette Parish [Correctional Center][1] because they are unable to pay a sum of money required by post-arrest secured money bail setting procedures." [Doc. No. 181].

Little was arrested on June 3, 2017, on a charge of felony theft and detained at the Lafayette Parish Correctional Center ("LPCC"). On the following day, Defendant Commissioner Thomas Frederick ("Commissioner Frederick") determined probable cause for his arrest and set his bail as a $3,000 secured bond. Little could not afford to pay that amount and remained incarcerated until June 10, 2017.

Murphy was arrested on February 3, 2018, on a charge of felony possession of narcotics and two related misdemeanors. She was detained at the LPCC. Commissioner Frederick determined probable cause for Murphy's arrest and set her bail as a $2,500 secured bond. She then appeared via closed-circuit television at a 72-hour hearing before Commissioner Frederick, in which he affirmed the bond amount. Murphy could not afford that amount of bond and remained incarcerated until February 10, 2018.

Commissioner Frederick is the Commissioner for Louisiana's Fifteenth Judicial District. In that role he makes the initial bail determinations for all arrestees in Lafayette, Vermillion, and Acadia Parishes.

Defendant Judge Kristian Earles, former Chief Judge of the Fifteenth Judicial District Court, promulgated the bail schedule previously used by the District.[2]

---

[1] Plaintiffs refer to Lafayette Parish Jail, but the Court uses the correct name of the facility.

[2] Although Judge Earles remains a Defendant in this action, he was not identified as such in the parties' pre-trial order.

**<u>Claims</u>**

Plaintiffs contend that Defendants violated the Fourteenth Amendment's Due Process and Equal Protection clauses by the application of policies that result in the jailing of persons because of their inability to make a monetary payment.[3] Plaintiffs further contend that Defendants violated Plaintiffs' fundamental rights to pretrial liberty by placing and keeping them in jail because they cannot afford to pay the monetary bail amount set, without inquiry into and findings concerning ability to pay or non-financial alternative conditions. Plaintiffs request that the Court issue the following relief:

(1) An order and judgment permanently enjoining[4] the Defendants from using money bail to detain any person without procedures that ensure an inquiry into and findings concerning the person's ability to pay any monetary amount set and without an inquiry into and findings concerning non-financial alternative conditions of release; and

(2) A declaratory judgment that the Defendants violated Plaintiffs' constitutional rights by setting secured financial conditions of release without inquiring into or making findings as to whether arrestees can pay the amounts set, and without considering non-financial alternative conditions of release.[5]

---

[3] Plaintiffs do not contend that any policy is unconstitutional on its face, but only as applied.

[4] Plaintiffs sought a preliminary injunction, but that request is now moot as a trial on the merits has been held.

[5] During the pre-trial conference, Plaintiffs' counsel confirmed that they have abandoned their claim for attorneys' fees and costs pursuant to 42 U.S.C. § 1988. [Doc. No. 181].

## Commissioner Frederick's Standard Procedures in Setting Conditions of Pretrial Release Before the Initial Appearance

Commissioner Frederick estimates that he determines bail for at least 6,500 arrestees per year. Prior to February 2018, a bail schedule governed the release of certain misdemeanor offenses, meaning that Lafayette Parish Sheriff's deputies would refer to a predetermined list of bond amounts, organized by offense, to determine the conditions of an arrestee's pretrial release. The most recent bail schedule was ordered by then-Chief Judge Earles in 2013.

In February 2018, the judges of the Fifteenth Judicial District issued an en banc order rescinding the previous schedule and replacing it with an order requiring the Sheriff to automatically release with a summons all persons arrested on certain misdemeanor charges—unless it was their third arrest within six months—while requiring all other misdemeanor arrestees to have bonds set in the same manner as felony arrestees.

As a result, a written schedule of predetermined bond amounts is no longer in use for misdemeanor and felony arrestees in the Fifteenth Judicial District. The en banc order was revised in August 2018 to list all misdemeanor charges for which there would not be an automatic release with a summons, directing the Sheriff to release all others unless it was their third arrest within six months.[6] All persons arrested for the misdemeanors listed on the order would have their bonds set in the same manner as felony arrestees.

---

[6]The Order lists the following offenses for there is no automatic release:

Battery on a Police Officer
Battery on a Correctional Facility Employee
Battery on a Dating Partner
Battery on the Infirmed or Aged
Domestic Abuse Battery

Although the wording of the orders differed, the substance of the August 2018 order remained the same as its predecessor. For a person arrested on a warrant, Commissioner Frederick sets a secured bond amount at the time he approves the warrant. When an arrest warrant has been signed by another magistrate or judicial officer who did not specify a bond amount on the face of the warrant, Commissioner Frederick will set that person's bond after arrest.

For those warrantless arrestees who have not been automatically released on a summons or who were arrested on warrants without specified bond amounts, Commissioner Frederick calls the jail three to six times per day (365 days per year) to set their bonds. [Doc. No. 195, p. 9]. Upon calling the jail, Commissioner Frederick speaks to an employee of the Lafayette Parish Sheriff's

---

Vehicular Negligent Injuring
Stalking
Cyber stalking
Cyber bullying
Sexual Battery
Interference with Child Custody
False Imprisonment
Unauthorized removal of a motor vehicle
Online impersonation
Violation of Protective Order
Criminal Abandonment
Carnal Knowledge of Juvenile
Sexting
Prohibited sexual conduct between educator and student
Illegal Discharge of a Firearm
Carrying a Concealed Weapon
Illegally Supplying a felon with a firearm
Possession of a firearm on premises of alcoholic beverage outlet
Possession of a firearm in a firearm free zone
OWI
Driving Under Suspension
Hit and Run
Sexual Acts in Public
Simple Escape
Possession of Marijuana (2nd or subsequent offense)
Possession of Drug Paraphernalia (2nd or subsequent offense)

[Doc. No. 133-2, Exh. A.].

Office who reads him the affidavit of probable cause for arrest. For some crimes—those involving a firearm, a sex offense, or a crime of violence—Commissioner Frederick will also inquire into the arrestee's criminal history. He asks for no other information before setting a secured bond amount for each arrestee.

Prior to May 24, 2018, Commissioner Frederick never received financial information from any arrestees prior to their initial appearance.

Sheriff Garber created an electronic "Pretrial Indigency Determination Affidavit" ("PIDA") that arrestees may complete using the Telmate kiosks in the jail. This PIDA first became available on May 24, 2018. When an arrestee completes the PIDA and "sends" it, an email goes to Commissioner Frederick. [Doc. No. 195, p. 9]. He receives PIDAs for two or three arrestees per day. The PIDA form asks arrestees about their monthly income, number of dependents, receipt of public assistance, employment status, and the "amount you could reasonabl[y] pay, from any source, including the contributions of family and friends." An arrestee's expenses are not included in the PIDA. Commissioner Frederick takes the PIDA into consideration only if the arrestees submit their information to him between their arrest and the time Commissioner Frederick calls the jail to set bonds. If an arrestee submits the PIDA, Commissioner Frederick receives the PIDA on his phone and his computer. Commissioner Frederick is unaware of whether arrestees are informed either of the availability of the PIDA upon arrest or that it must be submitted to him before he sets a bond amount.

Even without the PIDA, Commissioner Frederick considers the fact that the person is incarcerated and his personal knowledge of the local economy based on his 60 years of residency

and his experiences as a public defender for over a decade.  [Doc. Nos. 133-2, ¶ 3; 195, pp. 10-11].

Commissioner Frederick holds First Appearance hearings,[7] also referred to as "jail call," [Doc. No. 195, pp. 8-9], every Tuesday and Friday for each of the three parishes in the judicial district.  He conducts these hearings by video connection with each of the parish's jails. The arrestees are brought to a room in the jail with an audiovisual connection to the courthouse, where Commissioner Frederick conducts the hearing. Public defenders are generally not present in the jail with arrestees during the hearing. While Commissioner Frederick may refer arrestees to the services of the public defenders' office in the course of a first appearance, the public defenders' office does not represent arrestees in the hearing itself.   Each arrestee is brought before the video camera, and Commissioner Frederick describes the typical hearing as follows:

> I verify with them their name and their address. And, then I ask them for their date of birth just to make sure that they're not just telling me "yes, yes, yes" because sometimes they tell me that and when I ask them for their date of birth they—that's when I find out that they really can't speak English. And, then, once we get through that, I tell them what is listed on their inmate card, what they're being held for, what the charge -- if there's a charge, what the charge is, what the bond is, if they're being held on a warrant, like a bench warrant, not an arrest warrant, a bench warrant, and they have an attorney. I give them their attorney[']s name and number so they can contact them. We serve them with a new court date. If it's the ones that are just, you know, there's no warrants, no bench warrants or failure to appear warrants and it's just bond, I will ask them if they can afford an attorney and refer them to the public defenders office. And, then, they're given a sheet that has all kinds of information from the public defenders office including their phone number. It has what they need to do to get -- for a bond reduction. I think it may explain like what's the process, you know, arraignments and that kind of stuff. It may -- I don't know if it does or not, you know, like the time limits and stuff like that. If they're being

---

[7] Arrestees must make their first appearance within 72 hours of their arrest, so the Tuesdays and Fridays jail call schedule is designed to comply with that deadline.  *See* LA. C. CRIM. P. ART. 230.1

detained for another facility or another jurisdiction or anything, I tell them that or if they have like a parole warrant, I'll tell them that.[8]

Commissioner Frederick believes that he does not have authority under state law to reduce a bond amount set prior to the First Appearance hearing.[9]  If an arrestee at the First Appearance hearing informs Commissioner Frederick that he cannot afford the bond that has been set, prior to May 2019, he gave "them a phone number. They can apply through the STOP[10] program or they can contact their public defender to discuss their case and see about getting them a bond reduction."

Personal surety bonds or "signature bonds" were and are available as an alternative to a secured money bond, but, prior to May 2019,  Commissioner Frederick did not inform arrestees of their availability. To apply for a personal surety bond, an arrestee must have a family member who calls or visits Commissioner Frederick's office.  The requirements for a personal surety are that the surety be employed, be a close family member or friend, "have sufficient income to cover the bond," and that the arrestee not be a previously convicted felon or arrested on certain violent crimes.  None of these requirements are memorialized in a written policy.  Commissioner

---

[8] The parties stipulated to the majority of the facts contained in the Court's Findings of Fact.  The stipulations are contained in the pre-trial order [Doc. No. 178], which was approved by the Court.  [Doc. No. 182].  The Court has edited some of the stipulated facts for clarity, consistency, and/or style, but did not make substantive changes.  For example, the parties sometimes refer to "First Appearance" hearings and sometimes refer to "Intial Appearance" hearings.  The Court uses First Appearance hearings throughout this Opinion.

For those Findings of Fact not based on the stipulations, but on Commissioner Frederick's testimony or other record evidence, the Court has provided citations.

[9] Commissioner Frederick's belief is based on a decision of Louisiana's Third Circuit Court of Appeals.  In *State v. Broussard*, No. KW-09-00343 (La. 3d App. 3/20/09), the Third Circuit held that "La. R.S. 13:716(b)(2) limits [the authority of the commissioner] in **felony** cases, specifically providing, in part, that 'the commissioner shall not try and adjudicate preliminary hearings.'" [Trial Exhibit 20 (emphasis added)].  The Third Circuit then found that the commissioner in *Broussard* "was without authority to try and adjudicate the hearing conducted on the motion to reduce bond."  *Id.*  The *Broussard* decision does not apply to misdemeanor cases because a commissioner otherwise has authority to conduct "preliminary hearings."  *Id.*

[10] STOP is an acronym for the Sheriff's Tracking Offenders Program.

Frederick's secretary administers the screening and applications for personal surety bonds. Commissioner Frederick is unaware of how many people apply for such bonds per year. Commissioner Frederick is not made aware of applications for personal surety release that are denied by his secretary. "I would only be made aware of the ones who qualify." Arrestees have no means to appeal the denial of personal surety release by Commissioner Frederick's secretary.

Beginning in May 2019, Commissioner Frederick began using a form entitled, "Release Order in Lieu of/as Modification to Money Bond" ("Modification Form") [Doc. No. 195, p. 12; Defendants' Trial Exhibit 4; Doc. No. 191]. The Modification Form lists options to any secured bond set during his daily calls. Commissioner Frederick uses the Modification Form for both felonies and those misdemeanors for which release is not automatic. [Doc. No. 195, p. 57]. The Modification Form provides in pertinent part:

> Considering the factors set forth in CCrP. Article 316 and inquiry conducted by the Court, it is hereby ordered that the bond obligation of the arrestee, _____ is fixed/modified as follows (all initialed items apply):
>
> _____        Release on his/her personal surety is authorized
>
> _____        Post bond in the **adjusted** amount of _____
>
> _____
>
> _____        Release on Court-approved home monitoring via GPS system
>
>> _____        Curfew imposed from 7 P.M. to 6 A.M.
>>
>> _____        No contact with victim:_____
>>
>> _____        Random weekly drug screens
>>
>> _____        No alcohol possession or consumption
>>
>> _____        Arrestee shall not operate a motor vehicle that is not

equipped with a functioning ignition interlock
device

_____    Recommended for LPSO-STOP assessment; with release based on
LPSO-STOP recommendation and conditioned upon satisfactory
participation in LPSO Programs

_____    Other  _____

_____

THE ARRESTEE RELEASED ON THESE CONDITION[S] IS SUBJECT TO
IMMEDIATE ARREST AND RE-INCARCERATION UPON ANY
VIOLATION OF THESE CONDITIONS.

*Id.* The form also has a signature line for either Commissioner Frederick or one of the judges of

the Fifteenth Judicial District.

Although there is an option for a bond reduction, Commissioner Frederick explained that

this option is for the use of the district judges. [Doc. No. 195, p. 16]. If an arrestee tells

Commissioner Frederick that he cannot afford a bond, he refers the arrestee to one of the other

options, including release on personal surety. [Doc. No. 195, pp. 13, 49-52]. If an arrestee has a

history of failing to appear in court, he will not recommend that arrestee for the STOP program.[11]

With regard to the "other" option, Commissioner Frederick may, for example, refer the arrestee to

an inpatient drug treatment program. *Id.* at p. 52.

No video or audio recording is kept of the First Appearance hearings, and no transcript is

made. Commissioner Frederick makes no written or oral finding on the record of any kind.

---

[11] The arrestee still has the option of apply directly with the Sheriff for STOP.

Commissioner Frederick does not see arrestees again between their First Appearances and their arraignments. He has no knowledge of whether the secured bond amounts he sets are later reduced.

### Commissioner Frederick's First Appearances Hearings, in Practice

Little appeared before Commissioner Frederick via video on June 6, 2017, for his First Appearance hearing. He was not represented by counsel. Commissioner Frederick asked him no questions about his financial circumstances or his ability to afford the $3,000 bond imposed by Commissioner Frederick.

Murphy appeared before Commissioner Frederick via video on February 6, 2018, for her First Appearance hearing. During her hearing, Commissioner Frederick informed Murphy of her charges, informed her that she had a secured bond of $2,500, asked if she could afford a lawyer, and, when she responded "no," referred Murphy to the public defender.

Richard Robertson appeared before Commissioner Frederick via video on February 6, 2018, for his First Appearance hearing. Commissioner Frederick asked Robertson his name, date of birth, and address before informing him that his bond was set at $2,500. Robertson asked, "Is there any way we can do an ROR? I'm on probation, and I attended all of the court dates for my felony charge."  Commissioner Frederick told Robertson to apply for the STOP program, would not explain what the program was, asked Robertson if he could afford a lawyer, and, upon being told that he could not afford a lawyer, referred Robertson to the public defender's office before moving on to the next arrestee.

Charles Fontenot was arrested and detained in LPCC on March 20, 2018. When Fontenot was brought to his First Appearance hearing, Commissioner Frederick asked his name, date of

birth, and address. He then informed Fontenot that his bond would be set at $15,000, an amount

that Fontenot could not afford. Fontenot asked for a release on recognizance. Frederick responded

that Fontenot should talk the Sheriff's office about STOP. Fontenot said of STOP,

> I saw signs in the holding cells of the first floor of [LPCC] advertising the S.T.O.P.
> There is a $25 fee for applying for the program as well as a $7 daily fee. These are
> not fees that I can afford as I am currently [un]employed.[12] I also do not have a
> permanent residence so I suspect that I would not be eligible for the program.

At the time he swore out his declaration, Fontenot had been detained for eleven days.

Diondre Williams was arrested on March 19, 2018, and detained in the LPCC on a $50,000

secured bond, an amount that he could not afford. At his first appearance before Commissioner

Frederick, then-17-year-old Williams asked Commisioner Frederick, "How can I get out of here?

Is there any way?" Commissioner Frederick responded by referring Williams to STOP. He applied

for STOP numerous times, and each application was denied by the Sheriff without explanation. At

the time of his declaration, Williams had been incarcerated for eleven days.

### The Sheriff's Tracking Offender Program

Sheriff Mark Garber enforces the money-bail orders issued by Commissioner Frederick.

Commissioner Frederick, when told by arrestees that they cannot afford a secured bond amount,

refers arrestees to the STOP program.  The program is open only to those whose bonds are

$200,000 or lower. But beyond this qualification, Commissioner Frederick has no knowledge of

the criteria used to qualify a person for the program.   Commissioner Frederick's process for

approving a STOP application is as follows:  "Just sign my name to it. That's pretty much it. They

[the Sheriff's Office] do all the paperwork. They do everything, kind of like the personal surety.

---

[12] The stipulated facts state that Fontenot was "employed," but that statement is nonsensical in context.

12

They run the record, they do all their research, gather up all their stuff. If the guy qualifies, they come to either myself or one of the judges and say, "Will you sign this?" He remembers only ever having denied a single STOP application. He has never reviewed the Sheriff's decision not to approve an applicant for STOP.

### Experts

Plaintiffs also relied on testimony from two experts, to which the parties stipulated.

**A. Hon. Truman A. Morrison, III**

The Honorable Truman A. Morrison, III ("Morrison"), a retired judge, qualifies as an expert on issues relating to pretrial release and detention. The parties stipulated to his testimony about how the system in Washington, D.C., is run. He believes that secured money bail is neither useful nor necessary to ensure safety and court appearance.

In 1994, the Washington, D.C. Code was amended to state that financial conditions could be utilized to reasonably assure appearance only if they do not result in pretrial detention. In other words, if money is used, defendants are entitled to a bond they can meet. It has always been D.C. law that money may never be used to attempt to assure community safety. In practice today, financial conditions of release are almost never used for any purpose.

The overall post-arrest process for arrestees in Washington, D.C. is as follows: After an arrest, law enforcement agencies process arrestees at one of the city's local police districts. Many arrestees charged with nonviolent misdemeanors may receive a citation release from the police station, with a future court date provided. Otherwise, after processing, and depending on the time of day, arrestees are either transferred to court or to a holding facility to await an appearance in court the next day, save Sunday. Arrestees' first court appearance is either an arraignment (for

misdemeanors) or presentment (for felonies). At this initial appearance, the judge considers whether the defendant should be released or briefly detained pending a formal detention hearing within three to five days. After a formal hearing, the judge can order a person detained pretrial if he or she concludes that a defendant presents an unmanageable risk of flight or harm to the community.

Washington, D.C.'s pretrial system makes release and detention decisions based on the best estimate of the defendant's likelihood of returning to court and avoiding re-arrest without the use of money bail. The District[13] has high rates of court appearance and low rates of pretrial misconduct. In Washington, D.C., if money bail were to be imposed on a defendant, it would have to be set in an amount that the defendant has the present ability to pay. In practice, financial conditions are almost never used. In Washington, D.C., there are no people in the jail who are there pretrial solely because they cannot afford to pay a secured financial condition of release.

In Washington, D.C. in 2017, 94% of arrestees were released, and once again 98% of released arrestees remained free from violent crime re-arrest during the pretrial release period. 86% of released defendants remained arrest-free from all crimes. 88% of arrestees released pretrial made all scheduled appearances during the pretrial period. The District accomplishes these high rates of non-arrest and court appearances, again, without using secured money bonds. The relatively small number of accused persons presenting levels of pretrial risk that cannot be mitigated and managed in the community, after due process appropriate hearings, are preventively

---

[13] While the parties have stipulated to Judge Morrison's testimony, the "facts" contain language as if Judge Morrison were speaking. For example, this sentence has been modified from "We have . . ." to "The District" has "high rates of court appearance and low rates of pretrial misconduct." The Court finds this language to be confusing to the reader and therefore modifies it. Additionally, the Court has clarified Judge Morrison's current status. It is not the Court's intent to modify the substantive meaning of any stipulated facts, only to provide a clear opinion for the reader to follow.

detained until trial with no bond. Rich or poor, they await an expedited trial in the D.C. Jail. Last year D.C. preventively detained only 6% of all arrestees.

Many people require few, if any, conditions on their pretrial release in order to be successful – 25% of people released in Washington, D.C. are released on no conditions whatsoever. D.C. judges have numerous tools at their disposal to maximize court appearance and public safety for the vast majority of defendants without resorting to detention. Those tools include stay-away orders (for example, in shoplifting, assault, or domestic violence cases); counseling; drug, mental health, and alcohol treatment programs; reporting to pretrial services; mail, phone and text message reminders of court dates; drug testing; and very limited electronic and GPS monitoring can all be employed to reasonably assure high rates of court appearance and public safety.

**B. Michael R. Jones, Ph.D.[14]**

Michael R. Jones, Ph.D. ("Jones"), qualifies as an expert on issues relating to pretrial release and detention. Dr. Jones believes that, based on studies and empirical research on pretrial release and detention and pretrial risk management, local governments can more effectively manage arrestees' pretrial risk without resorting to secured money bail.

Dr. Jones opines that several studies have shown that secured money bail contributes to unnecessary pretrial detention. Arrestees who are required to pay secured money bail to be released wait in jail longer than arrestees who are released without being required to make a money payment.

---

[14]The parties also stipulated to Dr. Jones' testimony. The Court has been presented with this testimony as factual and has considered it. The Court is not bound to include the entire testimony "as is" in its Opinion. Dr. Jones' testimony/report was lengthy, and the Court has summarized that report.

Dr. Jones and his staff conducted an investigation for county-level decisionmakers in Jefferson County, Colorado. The investigation found that approximately 75% of arrestees who had not posted bail within 48 hours said that they or their family members were not able to the bond's financial conditions. Dr. Jones believes that secured money bail either denies release to or delays release for many arrestees who would otherwise be released on non-monetary conditions. Because Lafayette Parish used money bail for nearly all misdemeanor and felony arrestees, it was likely that these arrestees remained in jail.

Dr. Jones also testified that he believed pretrial detention for periods longer than 24 hours lead to negative outcomes for the justice system, the community, and defendants. He believes that Lafayette Parish's secured money bail system likely contributes to these defendants exhibiting more failures to appear in court and more criminal behavior, the defendants were more likely to plead guilty than other defendants, and the defendants have a greater likelihood of being sentenced to jail and with a longer sentence.

Dr. Jones further testified that pretrial detention for three days or fewer has been shown to negatively influence the arrestee's employment, financial situation, and residential stability, as well as the well-being of the arrestee's children.

Dr. Jones' study further revealed that releasing an arrestee on unsecured bond is as effective as secured money bail in achieving public safety and court appearances.

Based on these results, Dr. Jones concluded that jurisdictions can make data-guided changes to local pretrial case processing that would achieve their desired public safety and court-appearance results.

Dr. Jones further believed that the secured money bail system in Lafayette Parish is insufficient for managing pretrial risk. Studies have shown that court date reminders are the single most effective pretrial risk management intervention for reducing failures to appear.

## II.    CONCLUSIONS OF LAW

### A.  Consideration of Modification Form

As an initial matter, Plaintiffs objected at trial to the Court's consideration of the Modification Form in use by Commissioner Frederick since May 2019. They argued that the Modification Form should be excluded from the Court's consideration because it was created after his deposition (so they could not examine him on its contents), it was contradictory to the stipulated facts, and it was not listed as one of Defendants' exhibits.

Defendants responded that a copy of the Modification Form was provided to Plaintiffs during settlement discussions. Their counsel admitted that he failed to list the Modification Form as an exhibit because he did not know about the form. However, Defendants' counsel argued that the Modification Form should be considered as an actual assessment of Commissioner Frederick's current practices.

The Court "has broad discretion in deciding whether to admit into evidence exhibits not listed in the pre-trial order." *Gilbert v. Tulane Univ. (The Administrators of the Tulane Educ. Fund)*, 909 F.2d 124, 127 (5th Cir. 1990) (citing *Robert v. Conti Carriers & Terminals, Inc.*, 692 F.2d 22, 24 (5th Cir. 1982)). Given the significance of the form, its current use by Commissioner Frederick, and the fact that Plaintiff's counsel had previously been provided a copy of the form, the Court finds it appropriate to allow the form into evidence and to consider it. The Court does not condone or take lightly counsel's failure to identify the document as an exhibit, but finds no

malicious intent on counsel's part.  The Modification Form is an important part of Defendants' defense that they have voluntary ceased the actions giving rise to this lawsuit.  Finally, while Plaintiffs' counsel were unaware that Defendants intended to rely on the exhibit at trial,  they had previously received and reviewed a copy of the exhibit, and the Court granted Plaintiffs' counsel breaks prior to cross-examination to allow them to discuss how to address the Modification Form with Commissioner Frederick.    Plaintiffs' counsel was then able to cross-examine Commissioner Frederick about the form.  Finally, counsel was permitted to brief this issue before the Court made a final decision.  After review of the facts and arguments, the Court has allowed the Modification Form into evidence and will consider its use by Commissioner Frederick since May 2019.

## B.  Constitutional Considerations of Equal Protection and Due Process

Plaintiffs challenge Commissioner Frederick's practices as unconstitutional on three related grounds: equal protection, substantive due process, and procedural due process.

First, "[t]he incarceration of those who cannot [pay money bail], without meaningful consideration of other possible alternatives, infringes on both due process and equal protection requirements." *Pugh v. Rainwater*, 572 F.2d 1053, 1057 (5th Cir. 1978).  A person may not be "subjected to imprisonment solely because of his indigency." *Tate v. Short*, 401 U.S. 395, 397–98 (1971). That principle applies with greater force in the pretrial context, where the detainee is presumed innocent. *See Pugh*, 572 F.2d at 1056 (holding that the Constitution's prohibition on post-conviction wealth-based detention has "broader . . .  implications" for those "accused but not convicted of crimes").

Substantive due process protects a right to pretrial liberty that is "fundamental." *United States v. Salerno*, 481 U.S. 739, 750 (1987); *see also Foucha v. Louisiana*, 504 U.S. 71, 80

(1992)("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.") (quoting *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982)).

The Constitution also requires the government to provide procedural safeguards to protect against the erroneous deprivation of substantive rights. *Washington v. Harper*, 494 U.S. 210, 228 (1990). To determine whether those procedural safeguards are adequate, a court must first determine whether a liberty interest has been deprived and then ask whether the procedures accompanying the deprivation were sufficient. *See Caliste v. Cantrell*, 329 F. Supp. 3d 296, 312–13 (E.D. La. 2018).

The Fifth Circuit recently applied *Pugh* and again recognized the right against wealth-based detention without consideration of reasonable alternatives. In *O'Donnell v. Harris Cnty.*, 882 F.3d 147 (5th Cir. 2018) ("*O'Donnell I*"),[15] arrestees brought a civil rights action under 42 U.S.C. § 1983 against, among others, the county judges, alleging that the Harris County bail system resulted in the detention of indigent arrestees solely because of their inability to pay, thus violating Texas statutory and constitutional law and Due Process and Equal Protection Clauses of the United States Constitution. The district court determined that the plaintiffs had shown a substantial likelihood of success on the merits of their constitutional claims and granted a preliminary injunction. On appeal, the Fifth Circuit affirmed the district court's determination, but modified the basis for that determination under due process considerations and also modified the scope of the injunction.

---

[15]A Fifth Circuit panel originally issued a decision in this matter, *O'Donnell v. Harris Cnty.*, 882 F.3d 528 (5th Cir. 2018), but after the petition for rehearing, the Fifth Circuit withdrew that panel opinion and substituted this opinion in its place. The Court, therefore, refers to the decision after rehearing as *O'Donnell I*.

The decision did not address substantive due process, instead addressing the same issues set forth in this case under procedural due process and equal protection analyses. The *O'Donnell I* Court first addressed procedural due process. The court found a liberty interest under Texas state law, which "creates a right to bail that appropriately weighs the detainees' interest in pretrial release and the court's interest in securing the detainee's attendance[,]" while also forbidding "the setting of bail as an 'instrument of oppression.'" *Id.* at 158 (quoting *Taylor v. State*, 667 S.W.2d 149, 151 (Tex. Crim. App. 1984)).

Based on this liberty interest, the Fifth Circuit then reviewed the system in place at the time, guided by "a three-part balancing test that looks to 'the private interest . . . affected by the official action'; 'the risk of an erroneous deprivation of such interest through the procedure used, and the probable value, if any, of additional or substitute procedural safeguards'; and 'the Government's interest, including the function involved and the fiscal and administrative burdens' that new procedures would impose." *Id.* at 158-59 (quoting *Meza v. Livingston*, 607 F.3d 392, 402 (5th Cir. 2010) (other citations omitted). The *O'Donnell I* Court cautioned that "the quality of the procedural protections owed a defendant is evaluated on a 'spectrum' based on a case-by-case evaluation of the liberty interests and government burdens at stake." *Id.* at 159 (quoting *Meza*, 607 F.3d at 408-09). The Fifth Circuit agreed with the district court that the procedures in place were "inadequate" because "secured bail orders are imposed almost automatically on indigent arrestees" and thus arrestees are not protected from the setting of bail as an "instrument of oppression." *Id.; see also id.* (". . . the constitutional defect in the process afforded was the *automatic* imposition of pretrial detention on indigent misdemeanor arrestees . . .") (emphasis in original).

The *O'Donnell I* Court then addressed the procedures necessary to protect the "particularly important . . . right to pretrial liberty of those accused (that is, presumed innocent) of misdemeanor crimes upon the court's receipt of reasonable assurance of their return." *Id.* That interest was balanced against the particularly important government "interest in efficiency," which benefits the criminal defendant who may receive expedited release. *Id.* The Fifth Circuit also took note of the sheer number of bail hearings in Harris County each year with over 50,000 misdemeanor arrests in one year. Under the facts, the *O'Donnell I* Court agreed with the district court that due process required "'(1) notice that the financial and other resource information Pretrial Services officers collect is for the purpose of determining a misdemeanor arrestee's eligibility for release or detention; (2) a hearing at which the arrestee has an opportunity to be heard and to present evidence; [and] (3) an impartial decisionmaker.'" *Id.* However, the Fifth Circuit modified two remaining requirements to find that "magistrates . . . must specifically enunciate their individualized, case-specific reasons"; and that arrestees must be afforded a hearing within 48 hours. *Id.* While providing guidance, the Fifth Circuit left the specific drafting of the injunctive relief to the district court.

The *O'Donnell I* Court also considered whether plaintiffs had shown a likelihood of success on the merits that Harris County's misdemeanor bail system violated arrestees' equal protection rights. The Court found that plaintiffs had met their burden. The bail system "resulted in detainment solely due to a person's indigency because the financial conditions for release are based on predetermined amounts beyond a person's ability to pay and without any 'meaningful consideration of other possible alternatives.'" *Id.* at 162. The district court correctly applied intermediate scrutiny to the system because "heightened scrutiny is required when criminal laws

detain poor defendants *because* of their indigency." *Id.* Although the county "had a compelling

interest in the assurance of a misdemeanor detainee's future appearance and lawful behavior," its

policy "was not narrowly tailored to meet that interest." *Id.* The *O'Donnell I* Court "boiled" down

the equal protection analysis as follows:

> take two misdemeanor arrestees who are identical in every way—same charge,
> same criminal backgrounds, same circumstances, etc.—except that one is wealthy
> and one is indigent. Applying the County's current custom and practice, with their
> lack of individualized assessment and mechanical application of the secured bail
> schedule, both arrestees would almost certainly receive identical secured bail
> amounts. One arrestee is able to post bond, and the other is not. As a result, the
> wealthy arrestee is less likely to plead guilty, more likely to receive a shorter
> sentence or be acquitted, and less likely to bear the social costs of incarceration.
> The poor arrestee, by contrast, must bear the brunt of all of these, simply because
> he has less money than his wealthy counterpart. The district court held that this
> state of affairs violates the equal protection clause, and we agree.

*Id.* at 163.

On remand, the district court imposed a new injunction and denied a stay of that order. In

*O'Donnell v. Goodhart*, 900 F.3d 220 (5th Cir. 2018) ("*O'Donnell II*"), 14 of the 16 Harris

County judges sought an emergency stay concerning the portion of the injunction which required

the release of arrestees for the 48-hour period prior to their individualized bail hearing if the

misdemeanor arrestee was "not subject to a formal hold," had "executed an affidavit of financial

condition showing inability to pay," and have not been "granted release on an unsecured bond."

*Id.* at 222. The injunction "direct[ed] the County to release [these arrestees] if they would have

been released had they posted bond." *Id.* The *O'Donnell II C*ourt reversed the district court,

finding that it had violated the mandate and exceeded constitutional requirements.

In so ruling, the Fifth Circuit explained that such "relief would be warranted under due

process only were a substantive right to release at issue." *Id.* at 225. However, "[t]he identified

violation was the *automatic* imposition of bail. Individualized hearings fix that problem, so immediate release is more relief than required." *Id.* While "[r]elease might be warranted were 'one [to] assume[] a fundamental substantive due process right to be free from any form of wealth-based detention," there is no such right. *Id.*

Moreover, the *O'Donnell II* Court found that such release was not required by the Equal Protection clause. The Court noted that "[a] Equal Protection claim that an indigent 'person spends more time incarcerated than a wealthier person' is reviewed for a rational basis." *Id.* at 226. In its original review, the Fifth Circuit recognized that "some arrestees would continue to afford and pay bail while others would [not and would] avail themselves of the new hearing within 48 hours." *Id.* at 227. That is, the individualized hearing was an "inherent part of the calculus" to remedy the procedural violation. *Id.* Indeed, "[d]etetention of indigent arrestees and release of wealthier ones is not constitutionally infirm purely because of the length of detention," but because of the potential "consequences of such detention: likelihood of pleading guilty, the ultimate sentence given, and the social cost of a potentially lengthy pretrial incarceration." *Id.* at 227-28.

With these precepts in mind, the Court now turns to a review of the practices of the Fifteenth Judicial District.

### A. Mootness

Prior to any other analysis, the Court must consider Defendants' contention that Plaintiffs' claims are moot as a result of the changes in practice since this lawsuit was initiated in 2017.

Article III of the United States Constitution is limited to live cases or controversies. Even when a plaintiff has standing at the outset, "[t]here must be a case or controversy through all stages of a case[.]" *Fontenot v. McCraw*, 777 F.3d 741, 747 (5th Cir. 2015)(citing *K.P. v. LeBlanc*, 729

F.3d 427, 438 (5th Cir. 2013). Voluntary cessation of potentially infirm practices do not ordinarily render a case moot, and a heavy burden is generally placed on the defendant to make "it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 324-25 (5th Cir. 2009) (citing *Friend of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc*, 528 U.S. 167 (2000)).

However, a court is justified to treat a voluntary governmental cessation of possibly wrongful conduct with solicitude. *Id.* at 325. In fact, "[w]ithout evidence to the contrary, [the Court assumes] that formally announced changes to official governmental policy are not mere litigation posturing." *Id.* This results in a "lighter burden" on the governmental actors in their sovereign capacity, "to make 'absolutely clear' that the [unconstitutional] condition cannot 'reasonably be expected to recur.'" *Id.* (quoting *Friend of the Earth*, 528 U.S. at 189). This is so because governmental actors "are accorded a presumption of good faith due to their role as public servants and not self-interested private parties." *Id.*

The stipulated facts and Commissioner Frederick's testimony at trial, which the Court finds credible, establish that the Fifteenth Judicial District Court and Commissioner Frederick have adopted practices that render Plaintiffs' initial claims moot. At the time that Plaintiffs filed suit, a 2013 bail schedule governed the release of certain misdemeanor offenses. However, in February 2018, the judges of the Fifteenth Judicial District issued an en banc order rescinding the previous schedule. Since that time, Defendants have not used a bail schedule, and there is no evidence to suggest that they would return to its use after two years.[16] Likewise, at the time Plaintiffs filed

---

[16]Given the directives of the *O'Donnell* cases, *supra*, the Court finds it highly unlikely that judges and an appointed commissioner, who are duty-bound to apply the law, would ignore those directives and return to the use of a bail schedule or would fail to consider alternatives to secured bail.

suit, Commissioner Frederick did not obtain or consider the financial information provided by the PIDA or at the First Appearance hearing or consider alternative options. While it is undisputed that changes took place after this lawsuit was initiated, the evidence shows that the judges further modified the first order, and Defendants have continued to make additional changes to address any remaining constitutional issues since February 2018. Therefore, the Court finds that, to the extent that Plaintiffs seeks a declaratory judgment and injunctive relief based on the bail schedule and Defendants' prior practices, their claim is MOOT.

### B. Application of Law to Current Practices

#### 1. Substantive Due Process

> The Due Process Clause of the Fifth Amendment provides that "No person shall ... be deprived of life, liberty, or property, without due process of law. . . ." So-called "substantive due process" prevents the government from engaging in conduct that "shocks the conscience," *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952), or interferes with rights "implicit in the concept of ordered liberty," *Palko v. Connecticut*, 302 U.S. 319, 325–326, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937).

*United States v. Salerno,* 481 U.S. 739, 746 (1987). The "[Supreme] Court [has] acknowledged that there is a "'general rule' of substantive due process that the government may not detain a person prior to a judgment of guilt in a criminal trial," *id.* at 749, but this general rule has a "significant number of exceptions." *Id.* Indeed, "[t]he government's interest in preventing crime by arrestees is both legitimate and compelling." *Id.* (citing *De Veau v. Braisted*, 363 U.S. 144, 155 (1960)). While an individual has a "strong interest in liberty[,]" this "right may, in circumstances where the government's interest is sufficiently weighty, be subordinated to the greater needs of society." *Id.* at 750-51.

Likewise, an individual may not be "subjected to imprisonment **solely** because of his indigency," *Tate v. Short*, 401 U.S. 395, 397–98 (1971) (emphasis added), but there is no "fundamental substantive due process right to be free from any form of wealth-based detention." *O'Donnell II*, 900 F.3d at 225.

In this case, Plaintiffs' claims, like those in the *O'Donnell* decisions, do not invoke substantive due process concerns. Plaintiffs do not contend that Defendants cannot use "money bail to detain a person," [Doc. No. 1, p. 15], but, rather, that Defendants violated Plaintiffs' constitutional rights by failing "to inquire into and consider the Plaintiff class's ability to pay the secured money bail amounts that he sets" and without considering non-financial alternative conditions of release." [Doc. No. 140 pp. 13-14]; *see also* [Doc. No 1, p. 16].

However, the Court has concluded that Plaintiffs' prior claims based on the automatic imposition of bail under the prior bail schedule and under Commissioner Frederick's prior practices are moot. Plaintiffs' remaining claims do not raise substantive, but procedural due process concerns. Therefore, the Court will enter Judgment in favor of Defendants and against Plaintiffs as to their substantive due process claim.

### 2. Procedural Due Process

Plaintiffs have also asserted procedural due process claims pursuant to 42 U.S.C. § 1983. "Liberty interests protected by the Fourteenth Amendment 'may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies.'" *Jordan v. Fisher*, 823 F.3d 805, 810 (5th Cir. 2016), as revised (June 27, 2016) (quoting *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citations omitted)).

In contrast to *O'Donnell*, Plaintiffs do not assert that their liberty interests arise under state

law.  Rather, they rely on an arrestee's pretrial liberty interest, as a person who has been accused, but not convicted, of a crime and the right against wealth-based detention.  *See Salerno*, 481 U.S. at 750; *Caliste*, 329 F. Supp. 3d at 313 ("Plaintiffs successfully assert that they have been deprived of a liberty interest based on 'the well-established principle that an indigent criminal defendant may not be imprisoned solely because of her indigence.'. . . Additionally, Plaintiffs have been deprived of their fundamental right to pretrial liberty." (citation omitted)).

Nevertheless, under the second step of the analysis, the procedural safeguards discussed in *O'Donnell* apply here.  As always, the Court must consider whether the procedures in place "adequately protect" Plaintiffs' interests.  892 F.3d at 158.  In this endeavor, the Court is guided by the three-part balancing test:  (1) "the private interest" at issue, (2) "the risk of an erroneous deprivation" absent the sought-after procedural protection, and (3) the state's interest in not providing the additional procedure.  *Mathews v. Eldrige*, 424 U.S. 319, 334–35 (1976); *see also O'Donnell*, 892 F.3d at 159.

In Louisiana, "the amount of bail shall be fixed in an amount that will ensure the presence of the defendant and the safety of any other person and the community.  LA. CODE CR. P. ART. 316.  Ten factors are considered into fixing the amount of bail:

(1)     The seriousness of the offense charged, including but not limited to whether the offense is a crime of violence or involves a controlled dangerous substance.

(2)     The weight of the evidence against the defendant.

(3)     The previous criminal record of the defendant.

(4)     The ability of the defendant to give bail.

(5)     The nature and seriousness of the danger to any other person or the community that would be posed by the defendant's release.

27

(6)     The defendant's voluntary participation in a pretrial drug testing program.

(7)     The absence or presence in the defendant of any controlled dangerous substance.

(8)     Whether the defendant is currently out on a bail undertaking on a previous felony arrest for which he is awaiting institution of prosecution, arraignment, trial, or sentencing.

(9)     Any other circumstances affecting the probability of defendant's appearance.

(10)    The type or form of bail.

LA. CODE CR. P. ART. 316.  Plaintiffs do not challenge article 316 or any other policy or order of Defendants on their face, but only as applied.

In application, the Court has found that Defendants have made significant changes in their bail procedures since this lawsuit was initiated.  Since February 2018 the bail schedule was abolished.  Since August 2018, it is clear that for most misdemeanors an arrestee will be "booked and released."  For persons who have been arrested for a third time within six months, for more serious misdemeanors and for felony offenses, Commissioner Frederick uses the same procedures.

Commissioner Frederick calls the jail three to six times per day (365 days per year) to set their bonds.  He is read the probable cause for arrest, he may inquire into the arrestee's criminal history (depending on the type of crime), and, since May 24, 2018, he reviews a PIDA if the arrestee has filled it out.  That form contains information about income, dependents, receipt of public assistance, employment status, and the amount the arrestee could reasonably pay.  While Plaintiffs point out that Commissioner Frederick did not know if or how arrestees are made aware that they can fill out the PIDA, he also testified that he receives PIDAs for two or three arrestees per day.

28

Even without the PIDA, Commissioner Frederick has consistently testified that he is aware that the person is incarcerated, that he has personal knowledge of the local economy, and that he has over a decade of experience as a public defender.

These are not the only protections offered. After the initial call Commissioner Frederick makes to the jail, he holds First Appearance hearings (also referred to as "jail call") by video conference every Tuesday and Friday for each of the three parishes in the judicial district. During the First Appearance hearing, Commissioner Frederick will ask if the arrestee can afford a lawyer, and, if warranted, will ask if the arrestee can afford bail. If the arrestee indicates that he cannot afford bail, Commissioner Frederick refers to his Modification Form, which provides alternatives to arrestees after determining the underlying background of the arrestee and the offense. The changes in practice described by Commissioner Frederick are not "cosmetic," but true possible alternatives to money bail, including recommendation to the Sheriff's STOP program, release on personal surety, ankle monitoring, home monitoring, or other options, including, for example, an inpatient drug treatment program.

Defendants have stipulated that Commissioner Frederick makes no findings on the record, but it is clear that he now considers an arrestee's indigency or financial condition if the arrestee raises it. He also expressly considers on a case-by-case basis whether these alternatives are appropriate, taking into account criminal history, background, and the arrestee's ability to pay where applicable. In fact, Commissioner Frederick testified that, in some cases, he will not ask if the arrestee can make bail at the 72-hour hearing if he determines that arrestee has a higher risk of missing Court.

Plaintiffs presented expert testimony of the pre-trial procedures and systems in place in D.C. and the efficacy of secured bail versus alternative conditions. The experts, Dr. Jones and Judge Morrison, believe that secured money bail systems should be replaced with systems that do not use secured money bail, and cite data and studies to support those opinions. However, it is not the job of this Court to dictate to the Fifteenth Judicial District Court what type of bail system it should have, but to determine whether the system in place is constitutional. As the Fifth Circuit instructed in *O'Donnell I*, "the quality of procedural protections owed a defendant" is on a "spectrum" based on a "case-by-case evaluation" of the competing liberty and government interests.[17] 892 F.3d at 159. The current procedures now result in the automatic release of most misdemeanor arrestees, which is more than the Constitution requires. For the remaining more serious misdemeanor and for felonies, contrary to Plaintiffs' assertions, the Court finds that there is a greater government interest in ensuring their future appearance and lawful behavior. Even so, the Court finds that Defendants have provided adequate procedural protection to these arrestees to ensure that their liberty interests are being protected, and they are not being held solely because of their indigency. Therefore, no declaratory or injunctive relief is warranted. Judgment is entered in favor of Defendants and against Plaintiffs on the procedural due process claims.

### 3. Equal Protection

Finally, Plaintiffs have asserted equal protection claims under 42 U.S.C. § 1983. Arrestees cannot be incarcerated solely because they cannot afford to pay a secured bond when their wealthy arrestees would have been allowed to go free.

---

[17]To this extent, expert testimony about pre-trial release systems and procedures in other locations, particularly a large city like Washington, D.C., which is not comparable to the parishes in the Fifteenth Judicial District, has limited usefulness. There is no evidence to suggest that there is comparable funding or programs in the District to what is available in D.C.

The Court has considered whether Defendants' orders, policies, and practices are "narrowly tailored" to address their compelling interest in assuring the "future appearance and lawful behavior" of the more serious misdemeanor and felony arrestees. *See O'Donnell I*, 892 F.3d at 162. For the reasons identified, the Court finds that they are so narrowly tailored. Most misdemeanor arrestees go free, regardless of wealth (or lack thereof) under current practices. As to the remaining arrestees, there are two opportunities for Commissioner Frederick to consider their financial condition. If they have provided the PIDA, Commissioner Frederick considers that information during his call to the jail, along with his personal knowledge of the economics of most criminal defendants in the Fifteenth Judicial District. That is not all, however, because within 72 hours he provides the arrestees a second opportunity to inform him they cannot afford bail at the First Appearance hearing. If they inform him that they cannot afford bail, he turns to the Modification Form to see if there are alternatives he can offer to each particular arrestee. This individualized consideration, along with the other facts set forth above, are sufficiently narrowly tailored to address Defendants' lawful concerns. Judgment is also entered in favor of Defendants and against Plaintiffs on their equal protection claim.

## III. CONCLUSION

For the foregoing reasons, judgment is entered in favor of Defendants and against Plaintiffs.

Monroe, Louisiana, this 7th day of February, 2020.

_____
TERRY A. DOUGHTY, JUDGE
UNITED STATES DISTRICT COURT

31